**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|                                          |   |                        |
|------------------------------------------|---|------------------------|
|                                          | * |                        |
| **JUANETTE CULBRETH,**                   | * |                        |
|                                          | * |                        |
| *Plaintiff*                              | * |                        |
|                                          | * |                        |
| v.                                       | * | Case No.: RWT 10cv3321 |
|                                          | * |                        |
|                                          | * |                        |
| **WASHINGTON METROPOLITAN**              | * |                        |
| **AREA TRANSIT AUTHORITY**               | * |                        |
|                                          | * |                        |
| *Defendant.*                             | * |                        |
|                                          | * |                        |

## <u>MEMORANDUM OPINION</u>

On October 15, 2010, Plaintiff, Juanette Culbreth, filed the instant action in the Circuit Court for Montgomery County Maryland, and on November 23, 2011, the case was removed to this Court by the Defendant, Washington Metropolitan Area Transit Authority (WMATA). *See* ECF No. 1. In her Complaint, Plaintiff, a former Metrorail train operator, alleges that WMATA violated Title VII of the Civil Rights Act, and Title II of the Genetic Information Nondiscrimination Act (GINA) by discriminating against Plaintiff because of her disability. *See* Compl. ECF No. 2.

### <u>Background</u>

#### A. The August 19, 2009 Incident and the September 11, 2009 Termination

Plaintiff began work with WMATA on December 24, 1989 and worked as a Metrorail station manager. On August 19, 2009, Plaintiff was assigned as a station manager at the Silver Spring Metrorail Station. Because Plaintiff arrived early that day, she attempted to run an errand and pick up her belongings at another station. However, the train was delayed and Plaintiff returned to the kiosk to retrieve her work bag prior to her shift. Plaintiff was unable to do so

because Daryl Harrison, a station manager, was standing in the doorway blocking the kiosk. Plaintiff became very upset, started crying, and experienced an anxiety attack.

Shortly thereafter, Plaintiff went to the blockhouse at the station to see Mr. A.Q. Harrison, the terminal supervisor, and Plaintiff was hysterical.  Supervisor A.Q. Harrison called Station Manager Daryl Harrison.  Then, Plaintiff called WMATA's Central Control.  When Supervisor A.Q. Harrison joined the call to WMATA's Central Control on a nearby phone, Plaintiff hung up.  Plaintiff left the blockhouse and went downstairs in the station to compose herself.

Plaintiff spoke briefly with another station manager.  The conversation was interrupted by a telephone call, which the station manager answered. The station manager informed Plaintiff that Terminal Supervisor A.Q. Harrison wanted to speak to her, but Plaintiff refused to speak with him.

Plaintiff then reported to the kiosk on the other side of the station where she was scheduled to work. Supervisor A.Q. Harrison called Plaintiff and told her that he was taking her out of service and that Supervisor Smoot would escort her for a substance abuse test. Plaintiff did not go with Supervisor Smoot for the test, but left work in her truck.

On August 20, 2009, Plaintiff was interviewed by Belynda Jones, Director, RTRA Field Operations and others regarding the August 19, 2009 incident.  Plaintiff was directed to complete an incident report concerning the August 19, 2009 incident, but she refused to complete the report. WMATA terminated Plaintiff on September 11, 2009, in light of the August 19, 2009 incident and Plaintiff's refusal to complete a report or undergo drug testing.

B.   Other Proceedings: Grievance Procedure, D.C. District Court Litigation, and the EEOC Process.

In an effort to try and rejoin WMATA, Plaintiff filed a grievance on October 2, 2009 through a process established by WMATA and her union, Local 689.   On June 16, 2010, WMATA and Local 689 entered into an agreement as part of the grievance process that Plaintiff initiated on October 2, 2009.  The agreement reinstated Plaintiff as a Station Manager for one day for the sole purpose of allowing Plaintiff to make application to the Retirement Allowance Committee for disability.

On October 16, 2009, Plaintiff filed a Complaint against WMATA and Amalgamated Transit Union Local 789 in Superior Court for the District of Columbia under Title I of the American with Disabilities Act (ADA) alleging that WMATA and the union discriminated against her on the basis of an alleged mental disability.  On November 12, 2009, this Complaint was timely removed to the United States District Court for the District of Columbia.   On December 1, 2009, the District Court granted WMATA's motion to dismiss, concluding that "[i]t is well-established that WMATA possesses sovereign immunity, protecting it from private actions arising under federal statutes based on its performance of governmental functions, unless Congress has expressly abrogated that immunity pursuant to a valid exercise of its enforcement powers under Section 5 of the Fourteenth Amendment." *See* Memorandum Opinion, Culbreth v. WMATA, No. 09-2121 (ESH), ECF No. 6.  In *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001), the Supreme Court held that "Congress exceeded its enforcement powers under Section 5 to the extent that the ADA authorized suits against states or state entities," and thus the District of Columbia court concluded that WMATA cannot be held liable under Title I of the ADA.  *Id.*   The court remanded the case against Local 689 to the Superior Court, which subsequently dismissed the case based on Plaintiff's failure to prosecute.

3

On December 16, 2009, Plaintiff filed a Charge of Discrimination with the EEOC.  The Charge alleged that WMATA violated the ADA when it denied Plaintiff a reasonable accommodation for her alleged disability.  It also alleged that, although WMATA informed Plaintiff that she would be terminated for the August 19, 2009 incident and refusal to submit to drug testing, the termination was actually retaliation for engaging in protected activity under the ADA.  On July 16, 2010, the EEOC issued a right-to-sue letter based on Plaintiff's Charge.

C.  Procedural Posture

Plaintiff's suit alleges that WMATA violated Title VII and GINA for discriminating against Plaintiff because of her disability.  *See* Compl. ECF No. 2. Plaintiff seeks back pay, reinstatement and compensatory damages for pain and suffering.  *Id.*  On July 6, 2011, Defendant filed its Motion for Summary Judgment, ECF No. 38, and, on July 22, 2011, Plaintiff filed her Response in Opposition to Defendant's Motion for Summary Judgment and Cross-Motion for Summary Judgment.  ECF No. 39.  Both matters are fully briefed and ripe for adjudication.

## Discussion

A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Emmett v. Johnson,* 532 F.3d 291, 297 (4th Cir. 2008).  Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing

that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346

F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)).  "A mere scintilla of proof ...

will not suffice to prevent summary judgment."  *Peters v. Jenney,* 327 F.3d 307, 314 (4th Cir.

2003).  "If the evidence is merely colorable, or is not significantly probative, summary judgment

may be granted."  *Liberty Lobby,* 477 U.S. at 249–50. (citations omitted).   At the same time, the

court must construe the facts that are presented in the light most favorable to the party opposing

the motion.  *See Scott v. Harris,* 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

A.  Plaintiff Fails to State a Claim under Title VII

Title VII prohibits employers from discriminating on the basis of an "individual's race,

color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  To establish a *prima facie*

case of discrimination under Title VII, courts employ a burden shifting framework that is used in

the absence of direct proof of intentional discrimination.  First, the Plaintiff must demonstrate

that (1) she is a member of a protected class; (2) she was qualified for her job and her job

performance was satisfactory; (3) she was fired; and (4) other employees who are not members

of the protected class were retained under apparently similar circumstances.  *See Hughes v.

Bedsole*, 48 F.3d 1376, 1384 (4th Cir. 1995); *Cook v. CSX Transp. Corp*., 988 F.2d 507, 511 (4th

Cir.1993).  If the Plaintiff succeeds in proving a *prima facie* case, the burden of going forward

shifts to the employer, who must then articulate a non-discriminatory reason for the difference in

treatment.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Once the employer

articulates a non-discriminatory reason for its action, the burden shifts back to the Plaintiff to

demonstrate that the employer's reason was a pretextual one.  *Id.*

In the present case, Plaintiff alleges that she was discriminated against because WMATA

failed to accommodate her alleged disability.  However, Title VII protects individuals from being

discriminated against on the basis of an "individual's race, color, religion, sex, or national origin," *see* 42 U.S.C. § 2000e-2(a)(1), not an individual's alleged disability.  Because Plaintiff does not allege in her Complaint or Charge that she was discriminated because of her membership in a protected class, her Title VII claim fails.

Even if Plaintiff could establish a *prima facie* case, Plaintiff's Title VII claims still fail. Defendant articulated a legitimate non-discriminatory reason for terminating Plaintiff: Defendant terminated Plaintiff because she failed to submit to drug testing on August 19, 2009 following the incident and failed to fill out the required incident report form the next day. Plaintiff has offered no evidence that Defendant's reason was pretextual, and, for this reason, Plaintiff's Title VII claim is without merit.

To the extent Plaintiff attempts to bring a retaliation claim under Title VII on the basis that her alleged protected activity is a request for an accommodation, this claim also fails.  *See Muszak v. Sears, Roebuck & Co.*, 63 F.Supp.2d 292, 300 (W.D.N.Y.1999) ("[A] Title VII retaliation claim must be for actions protected by Title VII, and, quite simply (unlike the ADA that has its own retaliation prohibition), Title VII does not protect a request for an accommodation on the basis of an alleged disability"); *Cody v. County of Nassau*, No. 08-5127, 2009 WL 2958742 at *1 (2d Cir. Sept. 16, 2009) ("At the outset we note that [Plaintiff's] retaliation claim brought pursuant to Title VII fails as a matter of law because although Title VII protects an employee from retaliation resulting from a claim of discrimination based on 'race, color, religion, sex, or national origin,' 42 U.S.C. § 2000e-2, it does not protect an employee on the basis of disability...."); *Fleeger v. Principi*, No. 03-735, 2005 WL 2176837 at * 4 (W.D.Pa. Aug. 15, 2005) (Plaintiff has failed to state a retaliation claim under Title VII, because it has nothing to do with discrimination based on an alleged disability).

B. Plaintiff's GINA Claims

      *1.  Plaintiff Fails to State a Claim Under GINA*

Under GINA, it is an unlawful employment practice for an employer "to fail or refuse to hire ... or otherwise to discriminate against any employee ... because of genetic information with respect to the employee."  42 U.S.C. § 2000ff–1(a)(1). "Genetic information" with respect to any individual is defined as "information about (i) such individual's genetic tests, (ii) the genetic tests of family members of such individual, and (iii) the manifestation of a disease or disorder in family members of such individual."  42 U.S.C. § 2000ff(4)(A). Genetic information does not include information about the sex or age of any individual.  42 U.S.C. § 2000ff(4)(C).

There is simply no factual support for the vaguely asserted GINA claim  in Plaintiff's Complaint.  Plaintiff admits in her deposition that she never underwent genetic testing and that WMATA never had access to Plaintiff's genetic information.  For this reason alone, her GINA claims must be dismissed.

      *2.  WMATA is not Subject to Suit Because GINA does not Abrogate WMATA's Eleventh Amendment Immunity*

Defendant also argues that even if there were factual support for Plaintiff's claim, WMATA is not subject to suit because GINA does not abrogate the agency's Eleventh Amendment immunity.  This Court agrees.[1]

As a threshold matter, WMATA possesses Eleventh Amendment immunity conferred through an interstate compact.  *See Delon Hampton & Assoc. v. WMATA*, 943 F.2d 355, 359 (4th Cir. 1991).  Absent a waiver, WMATA can only be subject to suit if GINA validly abrogates the agency's Eleventh Amendment immunity.  In *Seminole Tribe of Florida v. Florida*, 517 U.S. 44,

---

[1] This issue has never been directly addressed by any court, and is one of first impression.  To the extent that there is any factual support for Plaintiff's GINA claim, it is barred on Eleventh Amendment immunity grounds as explained below.

55 (1996), the Supreme Court established a two-part test for determining if an act of Congress abrogates a state's Eleventh Amendment immunity: (1) Congress unequivocally declares an intent to abrogate; and (2) Congress must act pursuant to a valid exercise of its power. *See also Lizzi v. Alexander*, 255 F.3d 128,134 (4th Cir. 2001) (describing two-part test) (overruled in part on other grounds by *Nevada Dep't. of Human Resources v. Hibbs*, 538 U.S. 721 (2003)).

Congress clearly intended GINA to apply to states. First, Congress included "State employee" in its definition of employee. *See* 42 U.S.C. § 2000ff(2)(A)(ii). Moreover, in defining employer and employee, Congress explicitly incorporated language from an amendment to Title VII known as Government Employee Rights Act (GERA), 42 U.S.C. §§ 2000e-16c(a). As the title of GERA suggests, the amendment extended coverage of Title VII to government employees, including "[a]ny individual chosen or appointed by a person elected to public office in any State ... to be a member of the elected official's personal staff." 42 U.S.C. §§ 2000e-16c(a)(1). Courts have found the language contained in GERA to demonstrate "Congress's intent to abrogate sovereign immunity…[as] both 'unequivocal and textual'" *See e.g., Alaska v. EEOC*, 564 F.3d 1062, 1066 (9th Cir. 2009) (J. Kozinski). Because GINA incorporates the definition of employee and employer used in GERA and allows remedies for violations, including "back pay (payable by *the employer* ... responsible for the unlawful employment practice)," 42 U.S.C § 2000ff-6, cross-referencing 42 U.S.C. § 2000e-16c(b), cross-referencing 42 U.S.C. § 2000e-5(g) (emphasis added), GINA's text demonstrates a clear congressional *intent* to abrogate state sovereign immunity. *See also* H.R. Rep. No. 110-29 pt. 1, at 39 (2007) ("[T]he [GINA] legislation expressly covers state employees").

However, although Congress may have intended GINA to abrogate a state agency's Eleventh Amendment immunity, GINA is not a valid exercise of the congressional power to

abrogate immunity.  The Fourth Circuit has recognized that "[s]ince *Seminole Tribe*, the Court has made clear that Congress cannot abrogate Eleventh Amendment immunity using its Article I powers."  *See Lizzi*, 255 F.3d at 134 (citing *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 364 (2001) ("Congress may not, of course, base its abrogation of the States' Eleventh Amendment immunity upon the powers enumerated in Article I.")); *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 79 (2000) ("if the ADEA rests solely on Congress' Article I commerce power, the private petitioners in today's cases cannot maintain their suits against their state employers.").  Only where Congress enacts a statute under its Fourteenth Amendment, Section 5 power can Congress validly abrogate a state's immunity.  *See Garrett*, 531 U.S. at 364.

While the legislative history indicates that "the Constitutional authority for [GINA] is provided in the provisions of Article I, section 8, clause 3, which grants Congress the power to regulate commerce with foreign nations, among the several States, and with the Indian tribes," H.R. Rep. No. 110-29 pt. 3, at 32 (2007), the anti-discrimination goals of the statute suggest that GINA arguably may be viewed as Section 5 legislation.  *See* Harper Jean Tobin, *The Genetic Information Nondiscrimination Act of 2008: A Case Study of the Need for Better Congressional Responses to Federalism Jurisprudence*, 35 J. LEGIS. 11 (forthcoming), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1375684 (explaining that where the connection between an anti-discrimination statute and the enforcement of the Equal Protection Clause is obvious, courts will evaluate legislation under Section 5, and where no other constitutional basis was obvious from the legislation itself, courts will simply defer to Congress' statements regarding its basis for legislation).

However, in order for legislation to be enacted properly under Section 5, that legislation must be "congruent and proportional to the Fourteenth Amendment injury remedied."  *See Lizzi*,

255 F.3d at 134 (citing *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997); *Kimel*, 528 U.S. at 81; *Garrett*, 531 U.S. at 364).   Here, the legislative history does not indicate evidence of contemporary discrimination by states against employees on the basis of genetics.   The congressional findings reveal that states in the past have enacted laws permitting sterilization of people with presumed genetic defects.   *See* Pub. L No. 110–233, § 2, 122 Stat. 881, 882 (2008).   However "many of these State laws have since been repealed, and many have been modified to include essential constitutional requirements of due process and equal protection."  *Id.*; *see also* H.R. Rep. No. 110-29 pt. 1, at 40 ("The Supreme Court's earliest decision on the constitutionality of state sterilization statutes certainly does not reflect contemporary norms, but the case has never been officially overruled by the Court. *Skinner v. Oklahoma*, 316 U.S. 535 (1942)").

Because there is no evidence of a pattern or practice of discrimination by state employers on the basis of genetics, GINA is not congruent or proportional to the harm to be remedied.  *See Kimel*, 528 U.S. at 649 (finding the ADEA's extension to state employers to be neither congruent nor proportional because "Congress never identified any pattern of age discrimination by the States, much less any discrimination whatsoever that rose to the level of constitutional violation."); Jessica L. Roberts, *Preempting Discrimination: Lessons from the Genetic Information Nondiscrimination Act*, 63 VAND. L. REV 439, 486 (explaining "that GINA most likely would not satisfy the Court's congruence and proportionality test because of the limited evidence of existing genetic-information discrimination").[2]

---

[2] *But see* Tobin, *supra* at 27 (arguing that GINA's privacy provision, and GINA discrimination claims implicating race and sex equality concerns could be congruent and proportional to the harm to be remedied, given the Supreme Court's willingness in *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721 (2003) and *Tennessee v. Lane*, 541 U.S. 509 (2004) to look beyond recent constitutional violations contained in congressional findings especially where

Accordingly, even if Congress intended to act pursuant to Section 5, the legislation is not congruent or proportional to the injury, and any abrogation of Eleventh Amendment immunity was ineffective.

### C. Plaintiff's ADA Claims are barred by Res Judicata

To the extent that Plaintiff's Complaint can be construed as asserting a claim under the ADA, it is barred by the judgment in the District of Columbia litigation.  The purpose of *res judicata* is to bar the litigation of complaints that have already been resolved in order to limit unnecessary costs.  *Brown v. Felsen*, 442 U.S. 127, 131 (1979).  *Res judicata* also promotes the finality of judgments and provides closure to litigants.  *Montana v. United States*, 440 U.S. 147, 153 (1979).  A new suit is barred by *res judicata* if the following elements are met: (1) a final judgment on the merits in the prior suit; (2) identity of parties or their privies in both suits; and (3) identity of the causes of action in the two suits.  *Andrews v. Daw*, 201 F.3d 521, 524 (4th Cir. 2000).

To the extent Plaintiff's Complaint can be construed as an ADA suit, it is barred by the principles of *res judicata*.  Plaintiff's ADA claim against WMATA was dismissed on December 1, 2009 by the United States District Court for the District of Columbia.  Thus, there was a final judgment in the District of Columbia action with respect to the ADA claim.  That action involved the same parties in the instant suit: WMATA and Plaintiff.  Finally, the District of Columbia action involved the same ADA failure to accommodate claim as the instant suit. Accordingly, WMATA's Motion for Summary Judgment will be granted.

---

suspect classifications, like race or gender, or fundamental freedoms, like access to courts, are concerned).

A separate order follows.


Date: <u>March 19, 2012</u>                        <u>                    /s/                    </u>
                                                 ROGER W. TITUS
                                          UNITED STATES DISTRICT JUDGE